Robert D. QUIRK, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Samuel GOLDSTEIN, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 5289–5292.

United States Court of Appeals First Circuit.

Heard Dec. 4, 1957.

Decided Dec. 26, 1957.

Rehearing Denied Jan. 9, 1958.

Writ of Certiorari Denied March 17, 1958. See 78 S.Ct. 669.

Harry H. Toltz, Boston, Mass., for Robert D. Quirk, appellant.

Manuel Katz, Boston, Mass., with whom Paul T. Smith, Boston, Mass., and Albert F. Wood, Woburn, Mass., were

on the brief, for Samuel Goldstein, appellant.

George H. Lewald, Asst. U. S. Atty., Boston, Mass., with whom Anthony Julian, U. S. Atty., Boston, Mass., was on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

PER CURIAM.

These are appeals from judgments of conviction in criminal cases, in which the only question presented is whether the district court committed reversible error in denying motions by the defendants for judgments of acquittal.

One could perhaps wish that the government agents who raided the illegal still had expended a little more time and patience to "button up" the cases against the various defendants, instead of putting the government to the necessity of relying on the jury to convict on the basis of logical inferences from circumstantial evidence. Nevertheless, we think the cases were strong enough to warrant their submission to the jury, and that the judgments of conviction must stand.

Appellants Robert D. Quirk and Samuel Goldstein were convicted under indictments charging that they violated 18 U.S.C. § 371 by conspiring, with three other named persons, to commit various offenses defined in the federal liquor laws. In the course of the trial, the indictments against the other three persons were dismissed by order of the district court for lack of evidence.

Appellant Quirk was also convicted under an indictment charging, in four counts, the commission of various substantive liquor offenses, and appellant Goldstein was convicted under an indictment charging him with having aided and abetted Quirk in their commission.

There is no doubt that somebody was operating an illegal still at the Quirk farm in Sudbury, Massachusetts. This farm, though jointly owned by defendant-appellant Quirk and his mother, was actually run by the defendant. On the farm were a residence occupied by Quirk's parents, a residence occupied by Quirk, and several barns. Defendant Quirk's home was about 300 feet away from the barn in which the illegal distillery was being conducted, well within smelling distance in respect to the odor of mash, though Quirk insisted that he was completely unaware of what was going on in the barn.

Investigators of the Alcohol and Tobacco Tax Division, Internal Revenue Service, having detected the odor of mash, and three men, unidentified, having been observed to enter the suspected barn from the near-by cow barn, broke into the building on February 23, 1954, armed with a search warrant, the validity of which is not questioned. A padlock had to be forced, and no one was found in the building at the time.

However, the investigators did discover in the building a fully assembled still, which remained hot, though the electricity had been turned off. The assembly included a boiler, powered by an oil burner, two 275-gallon tanks, a 9 x 5 ft. horizontal still pot or cooker, a copper column extending from the cellar to the attic of the building equipped with water pressure tanks and pumps, condensers, a rectangular tank containing alcohol, and several other rectangular tanks containing "mash". Also found were several 5-gallon cans, some containing alcohol and others empty, sixty 100-lb. bags of sugar, 280 pounds of dry yeast, a bag of lump ammonia, and five pails of booster material. Electricity was supplied by an underground cable, and the cost of the current was charged to defendant Quirk. Water for the still assembly was supplied by an artificial pond in the rear of the building.

According to the testimony of defendant Quirk, he and his brother had left the Quirk farm shortly before the raid took place; when they returned he found the investigators at the barn and made his identity known to the agents. Though he stoutly denied knowledge of any of the illegal activities being con-

ducted in the barn, defendant Quirk was arrested at that time.

Quirk further testified that he had rented the barn on January 18, 1954, to an unprosperous-looking character whom he called "Joe Fuci," for the storage of machinery; that Joe paid in cash an advance of $25.00 for the first month's rental; that he had never seen or heard of Joe before, and never saw him since; that he had no curiosity at all as to why Joe should want to store machinery at the Quirk farm nor as to what type of machinery it was; that he never thereafter saw any smoke coming from the barn nor detected the smell of any odors; that he never saw anybody going to or coming from the barn after the alleged rental agreement; that it never struck him as curious that when February 18, 1954, came around, Joe Fuci did not present himself to pay the second month's rent. Joe Fuci was not produced as a witness, nor was any evidence offered to substantiate the story of the lease to him. Quirk's testimony concerning his activities during the period in question was seriously contradicted by various disinterested witnesses.

It was in evidence that sometime toward the end of 1953 Quirk had purchased two 275-gallon tanks and other assorted appliances similar in kind to those in the still assembly.

On this evidence the members of the jury were not naive enough to find Quirk innocent of the offenses charged in the indictments.

The case against Goldstein was perhaps weaker. There was no direct testimony to connect Goldstein with defendant Robert Quirk, who in fact denied ever having seen Goldstein before. The evidence was that the still pot or cooker and the rectangular tanks which were found as parts of the still assembly were articles which had been manufactured at Goldstein's order by the Wharf Forging & Welding Company. The official of this company who negotiated with Goldstein testified that Goldstein told him that the tanks were going to be used in a laundry somewhere in South Boston. Goldstein himself did not testify, nor did he offer any evidence tending to substantiate the existence of the alleged laundry in South Boston. Upon completion of the equipment pursuant to blueprints furnished by Goldstein, the latter paid for his purchases in cash and borrowed the company's truck to remove the tanks, which were later specifically traced to the still assembly at the Quirk farm.

■■ Goldstein's argument is based upon the pure assumption that he might have sold the tanks to Quirk sometime between the date of their purchase and the raid at the Quirk farm a few months later; and he argues that mere knowledge of an illegal purpose on the part of the buyer is not sufficient to convict the seller of engaging in a conspiracy with the buyer. Of course, this is not necessarily so, as is made clear in Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674. Besides that, the record contains not a scintilla of evidence indicating that any such sale was made to Quirk, or to anybody else. The jury were warranted in concluding that the equipment procured by Goldstein, and later found in the still assembly, was designed for the use to which it was put, and was acquired by Goldstein for the very purpose of its being subsequently incorporated in the still at the Quirk farm, by prearrangement with appellant Robert Quirk.

Judgments will be entered affirming the judgments of the District Court.